UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CLEMENTINE THOMAS, | ) | |
| Plaintiff, | ) | Case No. 04 C 3102 |
| | ) | |
| v. | ) | Judge Joan Lefkow |
| | ) | Magistrate Judge Geraldine Soat Brown |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| Defendant. | ) | |
| | ) | |

To:     The Honorable Joan Lefkow
        United States District Court Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

Plaintiff Clementine Thomas ("Plaintiff") seeks judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") pursuant to Title II of the Social Security Act, 42 U.S.C. § 423. Plaintiff seeks

summary judgment reversing the Commissioner's decision and directing the Commissioner to award

benefits to Plaintiff, or in the alternative, for an order remanding the case to the Commissioner for

further proceedings. (Pl.'s Mot. at 1.) [Dkt 9.] The Commissioner has filed a cross-motion for

summary judgment in her favor. (Def.'s Mot. at 1.) [Dkt 8.] The District Judge referred the motions

to this court for a Report and Recommendation. [Dkt 11.] For the following reasons, this court

respectfully recommends that Plaintiff's motion for summary judgment be granted, the

Commissioner's motion for summary judgment be denied, and the case be remanded for further

1

proceedings consistent with this decision.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on or about August 7, 2001. (R. 83-85.)[1] Plaintiff's claims were denied initially and upon reconsideration. (R. 65-68, 71-74.) Plaintiff requested a hearing on June 28, 2002, and a hearing was held before an Administrative Law Judge ("ALJ") on July 30, 2003. (R. 29-62, 75.) The ALJ issued an unfavorable decision on October 29, 2003, and the Appeals Council declined Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. (R. 4-6, 8-14.)

## BACKGROUND

Plaintiff was born on October 2, 1950[2] and was 52 years old at the time of the hearing. (R. 83.) She has an 11th grade education. (R. 34.) Plaintiff's past work experience consists of factory work as an assembler, a machine operator, and a packer. (R. 37-42, 96, 104-07.) Specifically, she

---

[1] The Commissioner states that Plaintiff applied for DIB on September 28, 2001 (Def.'s Mem. at 1), whereas Plaintiff states that she applied on May 24, 2001 (and, as indicated above, from the court's review of the application it appears that Plaintiff applied on August 7, 2001). (Pl.'s Mem. at 2.) It is not clear from the application which of these three dates is correct; however, that discrepancy does not affect the outcome of this report and recommendation.

[2] At the hearing, Plaintiff testified that she was born on October 22, 1950, and this date is reflected in the ALJ's decision and was used in Plaintiff's initial Disability Report. (R. 12, 34, 90.) However, Plaintiff's attorney represents that her actual date of birth is October 2, 1950, and in her application for disability insurance benefits, Plaintiff stated that she was born on October 2, 1950. (R. 83, 128.) The October 2, 1950 date is supported by many documents in the medical record. (R. 131, 160, 167.) The fact that Plaintiff's alleged onset date was changed to October 2, 2000 to coincide with her 50th birthday is further evidence that the October 22, 1950 date was a misunderstanding or typographical error by the ALJ. (R. 32.)

2

worked at Standard Grigby in the 1980s, E.B. Brown Inc. from 1989 to 1990, Duquenne Corporation from 1990 to 1998, and Benson Manufacturing from July 1998 to April 2000. (R. 36-42, 96, 104.) Plaintiff's attorney at the hearing characterized her past work as "light, unskilled" to "somewhat . . . sedentary." (R. 32.)

## A.    Medical Evidence

Plaintiff initially alleged that she became disabled on April 14, 2000. (R. 90.) That date was later amended to October 2, 2000.[3] (R. 7, 12, 32.) Plaintiff claims that she is disabled because she experiences heart murmurs, chest pains, difficulty breathing, dizziness, night sweats, cold feet, and pain in her arms and legs. (R. 42-47, 68, 74.) Plaintiff contends that those symptoms are a result of Wolff-Parkinson-White syndrome,[4] with which she was diagnosed in or prior to 1995. (R. 135.)

On December 11, 1995, five years prior to Plaintiff's onset of disability date, Plaintiff went to the emergency room of Provena Mercy Center complaining of sharp, intermittent chest pains. (R. 133.) Dr. William Mollohan reported that Plaintiff's EKG[5] showed a normal sinus rhythm and that Plaintiff was experiencing palpitations[6] and twinges in her chest which lasted 10-15 seconds. (R. 137-38.) Plaintiff denied that the discomfort radiated to other parts of her body or that she

---

[3] *Supra* n. 1.

[4] Wolff-Parkinson-White syndrome is a disorder of the rhythm of the heart beat. J.E. Schmidt, *Attorney's Dictionary of Medicine*, Vol. 6, W-35 (Matthew Bender, November 2004).

[5] EKG is an abbreviation for electrocardiogram, which is a graph that represents electric currents generated by the heart muscle as it works. *Id.* at Vol. 2, E-36, 43.

[6] A palpitation is a fluttering or an abnormally rapid beating of the heart. *Id.* at Vol. 4, P-20.

experienced any arm pain. (R. 137.) A preliminary diagnosis of Wolff-Parkinson-White syndrome was confirmed two days later after Plaintiff underwent a Holter monitor test.[7] (R. 135, 138.) Plaintiff was prescribed Inderal[8] for her palpitations. (R. 138.) Plaintiff was advised to follow up with her primary medical doctor in the near future and was released. (*Id.*)

On October 28, 1998, Plaintiff was admitted to the emergency room with complaints of muscle pain in her left leg. (R. 132.) Plaintiff stated that she had experienced the same pain two months before, but denied any numbness or tingling. (*Id.*) Plaintiff was given Demerol[9] and Vistaril[10] which relieved the pain. (*Id.*)

On May 24, 2001, Plaintiff completed a disability report, in which she reported a heart murmur, chest pain, difficulty breathing and pain in her right arm. (R. 94-95, 103.) She also stated that she "get[s] sick" when she has to work, and that she stopped working on April 14, 2000 when her employer closed down. (R. 95.) Plaintiff indicated that she was actually unable to work as of September 23, 1999, but that her condition got "worse after [she] kept working" until April 14, 2000. (*Id.*) The report also indicated that she had last visited a doctor and undergone medical tests that year, and that she had intended to schedule an appointment with Dr. Mollohan due to her complaints

---

[7] A Holter monitor is a portable device for recording an electrocardiogram (record of activity of the heart) over a period of 24 hours. *Id.* at Vol. 3, H-164-165.

[8] Inderal is the trademark name of a cardiovascular medicine used in the treatment of cardiac arrhythmia, among other things, which is the absence of a normal rhythm in the heart beat. *Id.* at Vol. 3, I-68; Vol. 1, C-69.

[9] Demerol is the trademark name of medicinal tablets for moderate to severe pain. *Id.* at Vol. 2, D-50.

[10] Vistaril is a medicine used to treat itching caused by allergies or to allay anxiety. *Id.* at Vol. 6, V-115.

4

of chest pain and shortness of breath. (R. 97-100.)

On November 7, 2001, Plaintiff underwent a consultative examination for the Bureau of Disability Determination Services. (R. 143-47.) The examination was conducted by Dr. Roopa K. Karri. (R. 146.) Plaintiff told Dr. Karri that she experienced rapid heart beat, shortness of breath, and chest pain. (R. 143.) She claimed that the shortness of breath occurred many times each day and lasted a few seconds when she was exerting herself by using the stairs and cleaning the house and when she was resting. (*Id.*) Plaintiff also complained of having a rapid heart beat every five to ten minutes sometimes. (*Id.*) Finally, Plaintiff told Dr. Karri that she experienced chest pains twice a week which lasted one to two minutes. (*Id.*) Although she reported no radiation of the pain, she stated that it occasionally caused dizziness. (*Id.*) In her impressions, Dr. Karri reported that Plaintiff had a history of a heart murmur which might be caused by aortic stenosis.[11] (R. 145.) Dr. Karri also reported a systolic murmur[12] which was radiating to the carotids[13] on both sides. (*Id.*) Dr. Karri noted Plaintiff's complaints of palpitations, shortness of breath and occasional chest pain. (*Id.*) A chest x-ray that was performed on Plaintiff was normal. (R. 146-47.)

On December 14, 2001, Dr. Virgilio Pilapil, a state agency non-examining physician, reviewed the evidence and opined that Plaintiff could frequently lift or carry up to 25 pounds and

---

[11] Aortic stenosis is an abnormal narrowing of the opening between the aorta and the left ventricle in the heart. *Id.* at Vol. 1, A-467.

[12] A systolic murmur is a heart murmur heard during the contraction of the ventricles. *Id.* at Vol. 5, S-458.

[13] The carotid is one of the two main arteries on each side of the neck which supply blood to the head. *Id.* at Vol. 1, C-91.

5

could occasionally carry up to 50 pounds.[14] (R. 148-49, 155.) Dr. Pilapil further opined that Plaintiff could stand or walk for about 6 hours in an 8-hour workday or could remain sitting for the same duration. (R. 149.) Dr. Pilapil indicated that Plaintiff had no postural limitations and was not limited in her ability to push and/or pull. (R. 149-50.) Dr. Pilapil further indicated that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations. (R. 151-52.) Dr. Pilapil concluded that Plaintiff's Residual Functional Capacity ("RFC") would be limited to medium work. (R. 155.) On March 29, 2002, Dr. Robert T. Patey, another state agency physician, reviewed the evidence in the file and agreed with Dr. Pilapil's assessment. (R. 148.)

On February 26, 2002, in a Reconsideration Disability Report, Plaintiff reported that she could not sleep at night because her "heart beat fast," she experienced dizziness, and she had pain in her hands and legs. (R. 120-23.) Plaintiff explained that she took Ibuprofen for the pain in her hands and legs. (R. 120.) Plaintiff also stated that her illness currently affected her ability to clean the house, cook, and drive a car. (R. 122-23.)

On March 12, 2002, Plaintiff was seen by the Fox Valley Cardiovascular Consultants. (R. 157-60.) Plaintiff stated that her problems had worsened over the past year and that her symptoms occurred several times a day. (R. 157.) Plaintiff also indicated that she was given medication (presumably, the Inderal) for her condition six years earlier, but that she stopped taking it when her prescription ran out. (*Id.*) In his impressions, Dr. Santosh Gill noted that Plaintiff experienced palpitations and recommended several diagnostic tests including an EKG and a Holter monitor test. (R. 157-59.) Plaintiff returned to the Fox Valley Cardiovascular Consultants on April 4, 2002, and

---

[14] Although the ALJ's opinion indicates that this examination occurred in 2000 (R. 12), the record shows that it took place in 2001. (R. 148.)

was prescribed Atenolol.[15]  (R. 165.)

On March 28, 2002, Plaintiff completed three questionnaires to supplement the information provided in her Request for Reconsideration.  (R. 112-19.)  In the activities of daily living questionnaire, Plaintiff stated that the only household chore she performed was dusting three times per week.  (R. 112.)  She also stated that the only medication that she was taking was Ibuprofen, which she took twice a day.  (*Id.*)  Plaintiff also indicated that she only leaves the house every two months when her daughter drives her to visit family and friends.  (R. 113.)  Plaintiff claimed that she cannot leave home alone because dizziness precludes her from taking long walks.  (*Id.*)  Plaintiff also indicated that she experiences difficulty sleeping because of headaches and a fast heart beat.  (*Id.*)  In the questionnaire regarding fatigue, Plaintiff stated that she is fatigued "all day" and that it takes her about three hours to recover from activity.  (R. 116.)  In the pain questionnaire, Plaintiff claimed that she experiences pain every 20 minutes and that although medication sometimes relieves the pain, the pain is "alway[s] there."  (R. 118.)

On June 28, 2002, after her Request for Reconsideration was denied, Plaintiff requested a hearing by an ALJ.  (R. 71-75.)  In her request, Plaintiff again complained of dizziness and headaches.  (R. 75.)  Plaintiff additionally complained of swelling in her hands and legs and problems with her neck and her shoulders.  (*Id.*)  In a statement apparently made in connection with her request, Plaintiff reiterated her complaints of neck pain, chest pain and inability to sleep at night, and noted that she now takes Ibuprofen three times a day and was also taking Atenolol for her symptoms.  (R. 126-27.)

---

[15]  Atenolol is a medicine used in the treatment of hypertension.  J.E. Schmidt, *Attorneys' Dictionary of Medicine*, Vol. 1, A-592.

On April 1, 2003, Plaintiff was admitted to Provena Mercy Center after experiencing palpitations and a brief episode of loss of consciousness. (R. 162.) She was seen by Dr. Jennifer Petersen, who reported that Plaintiff was folding clothes when she felt her heart fluttering. (*Id.*) Plaintiff then apparently lost consciousness for a few seconds, although she did not actually fall. (*Id.*) Dr. Petersen noted that Dr. Gill gave Plaintiff medication a year earlier, but she stopped taking it after three months. (R. 163.) Plaintiff reported that since her last doctor's visit, she continued to experience palpitations which lasted for about three minutes at a time. (*Id.*) An EKG was normal, and Dr. Petersen noted that when Plaintiff takes her Atenolol, "she is actually minimally symptomatic, but has been noncompliant." (R. 162, 164.) Plaintiff was discharged the next day and given a prescription for Atenolol and instructions to return for an EP (electrophysiology)[16] study. (*Id.*)

From May 23, 2003 to June 22, 2003, Plaintiff participated in an EP study on an outpatient basis. (R. 162, 167.) Dr. Petersen reported that Plaintiff transmitted 40 events during the 30-day period which were largely associated with fluttering. (R. 167.) Dr. Petersen also noted several episodes of chest pain over the duration of the study. (*Id.*)

On July 16, 2003, Plaintiff returned to see Dr. Gill. (R. 166.) She reported frequent palpitations but no further episodes of losing consciousness, and Dr. Gill again prescribed Atenolol. (*Id.*)

---

[16] An electrophysiological study is an investigation of the body dealing with the reaction of the body to electric influences. *Id.* at Vol. 2, E-56.

## B.    Plaintiff's Testimony

At the hearing before the ALJ on July 30, 2003, Plaintiff was represented by her attorney, George Weber. (R. 29, 31.) Plaintiff testified that over the last twenty years she had performed only factory work, which required her to stand all day and lift twenty to twenty-five pounds on a regular basis. (R. 37-42, 61.) Plaintiff testified that she experiences chest pain, dizziness, nervousness, and headaches as a result of Wolff-Parkinson-White Syndrome. (R. 42-43.) Plaintiff also stated that she experiences "hot sweats" that keep her up all night and wake her up out of her sleep. (*Id.*) In addition, Plaintiff testified that she has pain in her arms and legs that occurs three or four times a day. (R. 44-45.) Plaintiff stated that the pain feels like an aching and sometimes a throbbing that radiates from her shoulders to her fingers and through her lower legs. (R. 45-46.) Plaintiff also testified that the pain in her arms and legs lasts for about a half hour to an hour and that the pain is "[g]etting worse." (R. 47.)

Plaintiff explained that she experiences chest pain about four to five times during the day which lasts for "about a second or so." (R. 53.) Plaintiff stated that the pain is a "real sharp pain" and there is no warning before the pain begins. (R. 53-54.) When this occurs, Plaintiff testified that she feels out of breath, with dizziness and hot flashes. (R. 53.) Plaintiff testified that the pain is followed by twenty to thirty minutes of dizziness and sweating. (R. 54.) Plaintiff stated that those episodes are related to the heart flutters she experiences which occur more often than the chest pains. (R. 54-55.) Plaintiff explained that the flutters cause her heart to beat "real fast" and take her breath away. (R. 55.) Plaintiff testified that the heart flutters also last about a second and that it takes between 20 and 35 minutes to recover from the fluttering and dizziness. (R. 54, 55.)

Plaintiff also testified that she takes Atenolol for her symptoms, but that the medication

sometimes causes side effects of a cough and cold feet. (R. 43.) When questioned about Dr. Petersen's comments that Atenolol cured many of her symptoms, Plaintiff stated that she "still [has] problems all the time." (R. 43-44.) Plaintiff testified that even with the Atenolol she experiences fluttering, dizziness, and pain. (R. 59-60.) To relieve the pain in her arms and legs, Plaintiff takes extra-strength Tylenol, uses a heating pad, and lies down. (R. 45, 47.) Plaintiff also testified that she sees Dr. Gill, Dr. Petersen and Dr. Tabanet "once a month, twice a month or something" as a result of her condition. (R. 47-48.) Plaintiff confirmed that she does not have any insurance coverage to pay for her medical treatment and she owes her doctors money. (R. 61.) Plaintiff also testified that money is the reason she is not receiving more treatment. (Id.)

Plaintiff also described the April 2003 episode when she lost consciousness and went to the emergency room. Plaintiff testified, "I had pain in my chest and I got dizzy and I blanked out and I went to the emergency room." (R. 57.) Plaintiff explained that when she realized this was more serious than her everyday symptoms, her daughter took her to the emergency room. (R. 58.) Plaintiff confirmed that she was not taking the Atenolol at the time of the attack, but was instead taking Ibuprofen or Tylenol. (Id.) Plaintiff explained that she had been taking her medication, had stopped, and then started taking it again. (R. 58-59.) Plaintiff attributed her lapse in taking the medication to the fact that she "thought [she] was getting better." (R. 59.) Plaintiff testified that, because she realized that she was not getting better, she has taken the medication "every day" since April. (Id.)

Plaintiff also testified that her condition has had many effects on her day-to-day living. For example, Plaintiff testified that she has not driven since 2000 because her heart condition causes "dizzy spells and fainting spell[s] and headaches." (R. 35.) Plaintiff also testified that she is "scared

10

to walk" for fear of passing out. (R. 48.) Plaintiff does not go up or down stairs at all because she becomes out of breath. (R. 48-49.) Plaintiff claimed that even sitting and talking to someone for "about an hour or so" causes shortness of breath. (R. 56.) Plaintiff confirmed that her daughter has supported her for the last couple of years and that her daughter does all of her shopping. (R. 57.) Plaintiff testified that she cannot lift any part of the groceries and can only carry a "little light purse." (R. 49-50.) In addition, Plaintiff stated that she gets dizzy when she bends to pick something up off of the floor or reaches overhead. (R. 49, 50.) Plaintiff also stated that she only occasionally cooks or washes dishes and does not do any vacuuming, sweeping, dusting, or laundry. (R. 50.) Plaintiff testified that she attends church services about once a month but does not visit her family, go shopping, go out to eat, go to movies, or do yard work. (R. 51-52.) Finally, Plaintiff testified that she does not get dressed every day and spends most of her time "watching TV or something like that." (R. 52.)

## THE ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 416.920 (2003). Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the

11

RFC, despite her impairment, to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering her RFC together with her age, education, and work experience. *Id.*; *see also Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four; the burden shifts to the Commissioner at step five. *Young*, 957 F.2d at 389.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since October 2, 2000, her amended alleged onset of disability date.[17] (R. 12.) At step two, the ALJ found that Plaintiff had a severe impairment due to a congenital heart disease and a heart murmur. (*Id.*) At step three, the ALJ concluded that Plaintiff's impairments do not meet the requirements or equal the level of severity of any of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (*Id.*) At this step, the ALJ found that: "The medical evidence does not show all of the criteria of any cardiovascular impairment under Section 4.00 of the Listings. That is, there are not objective findings of Listing level severity, nor is [Plaintiff] under any continuing treatment." (*Id.*) The ALJ further noted that evaluations have revealed minimal clinical findings. (*Id.*) Therefore, the ALJ concluded that disability cannot be established on that basis. (*Id.*) Apparently, Plaintiff does not dispute that conclusion.

Between steps three and four, the ALJ assessed Plaintiff's RFC. (R. 12-13.) In his assessment of Plaintiff's RFC, the ALJ concluded that Plaintiff can perform a full range of medium work. (R. 12.) The ALJ stated that in 1995, Plaintiff was diagnosed with Wolff-Parkinson-White

---

[17] The ALJ incorrectly listed October 22, 2000 as the amended onset of eligibility date. *See supra* n. 1. The transcript from the hearing makes clear that the amended disability date is October 2, 2000. (R. 32.)

Syndrome, which causes an abnormal heart rhythm. (*Id.*, citing Ex. 1F.) He also noted that at the time of the diagnosis Plaintiff complained of chest pain but no shortness of breath, and that treatment records through 1998 revealed no significant abnormalities or limitations related to her cardiac diagnosis. (*Id.*) The ALJ then noted that in October 1998, Plaintiff was treated in the emergency room for leg pain. (*Id.*, citing Ex. 1F at 2.) The ALJ also noted that there was no further evidence of any cardiac treatment or examinations until November 7, 2001 when Plaintiff underwent a consultative examination. (*Id.*) The ALJ noted that in the consultative evaluation, Dr. Karri reported Plaintiff's history of heart murmur which may be caused by aortic stenosis, a systolic murmur radiating to the carotids, and symptoms of palpitations, shortness of breath and occasional chest pain related to the heart murmur, but noted that Plaintiff's chest x-ray was normal. (*Id.*)

The ALJ also noted that Plaintiff was seen by the Fox Valley Cardiovascular Consultants in March and April 2002, at which time she reported having symptoms several times a day, but that she had stopped taking her medications six years earlier when she ran out. (*Id.*, citing Ex. 4F at 2.) The ALJ found that even though Plaintiff currently has no insurance and her daughter financially assists her, a lack of finances does not appear to be a valid excuse for her failure to take medication from 1995 to 2000 because she worked until April 2000. (*Id.*) The ALJ further noted that Plaintiff received a prescription from Dr. Gill which she took for three months and then discontinued. (*Id.*, citing Ex. 6F at 2.) He then stated that Dr. Petersen's notes indicate that when Plaintiff takes Atenolol, "she is actually minimally symptomatic but has been non-compliant." (*Id.*, citing Ex. 6F at 1.)

The ALJ then discussed the state agency non-examining physician's report from December 2001 that concluded Plaintiff had a RFC for medium work. (*Id.*, citing Ex. 3F.) The ALJ noted that

13

the report must be treated as expert opinion evidence and given great deference. (R. 12-13.) The ALJ determined that nothing in the record contradicted those findings and that the report was consistent with the minimal medical evidence in the record. (R. 13.) The ALJ noted that no limitations had been recommended by any treating source to preclude medium work. (*Id.*)

The ALJ summarized Plaintiff's testimony as follows: that she had not worked since April 2000 because of her heart murmur, chest pain, and light arm pain; that she is unable to walk or stand for any length of time or do household chores; that she needs help from her children; that her condition has worsened; and that she takes extra-strength Tylenol, but does not take any prescription medication. (*Id.*) The ALJ found that testimony "not fully credible," concluding that Plaintiff's testimony was not supported by objective medical evidence, and that evidence in the record indicated that medication alleviates many of Plaintiff's symptoms. (*Id.*) In his credibility determination, the ALJ also found that Plaintiff is under no continuing treatment and takes only Tylenol, which he found inconsistent with her complaints of disabling pain. (*Id.*) Thus, the ALJ concluded that Plaintiff has the RFC to perform work-related activities except for work involving lifting or carrying over 50 pounds. (R. 14.)[18]

At step four, the ALJ concluded that Plaintiff could perform her past relevant work as a machine operator, assembler and packer because that work was performed at the light level and does not require the performance of work-related activities precluded by her RFC. (R. 13, 14.) Because the ALJ concluded that Plaintiff could perform her past relevant work, he did not address step five (*i.e.*, whether the claimant is able to perform any other work existing in significant numbers in the national economy). Based on his analysis, the ALJ concluded that Plaintiff was not disabled within

---

[18] Plaintiff's present motion objects to the ALJ's factual findings.

the meaning of the Social Security Act. (*Id.*)

## LEGAL STANDARD

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing court's role is limited. There, the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333.

15

Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (stating that "[t]he ALJ has the authority to assess the medical evidence and give more weight to evidence he finds more credible"). Where there is a conflict between medical opinions, the ALJ may choose between those opinions, but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, that does not mean that the ALJ is entitled to unlimited judicial deference. Regardless of whether there is adequate evidence in the record to support the ALJ's decision, the ALJ must build an accurate and logical bridge from the evidence to his conclusions, because the court confines its review to the reasons supplied by the ALJ. *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the ALJ's decision, the decision cannot be upheld. *Id.* The ALJ must state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333; *see also Young*, 957 F.2d at 393 (ALJ must articulate his reason for rejecting evidence "within reasonable limits" in order to allow for meaningful appellate review). The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## DISCUSSION

Plaintiff argues that the ALJ erred in his determination that Plaintiff is not disabled because

the ALJ failed to make a proper credibility assessment. (Pl.'s Mem. at 9-12.) The Commissioner argues that the ALJ's credibility determination was reasonable and supported by substantial evidence in the record. (Def.'s Mem. at 6-9.)

At the end of his opinion under "Findings," the ALJ stated: "The claimant's testimony was not fully credible as it was inconsistent with and out of proportion to objective medical evidence and her history of treatment." (R. 13.) Plaintiff argues that the ALJ's credibility determination was flawed because the ALJ did not follow Social Security Ruling ("SSR") 96-7p. (Pl.'s Mem. at 9-10.) Plaintiff argues that the ALJ, in finding Plaintiff's testimony not fully credible solely on the ground that it was not supported by objective evidence, did not take into consideration all of the evidence in the record. (*Id.* at 9-11.) Plaintiff contends her testimony and the evidence support a finding of disability because her symptoms of night sweats, cold feet, dizziness, shortness of breath, chest pain, arm pain, and frequent heart murmurs are consistent with Wolfe-Parkinson-White Syndrome. (*Id.* at 11-12.) Plaintiff claims that the ALJ failed to explain the reasons for rejecting substantial evidence in the record regarding Plaintiff's complained-of symptoms, and did not properly evaluate the effects Plaintiff's complained-of symptoms have on her functional ability to work. (*Id.* at 9-10.)

The Commissioner argues that the ALJ's credibility determination was properly made and was supported by substantial evidence. (Def.'s Mem. at 6-9.) The Commissioner argues that the ALJ acknowledged Plaintiff's testimony about her symptoms, but found that testimony not fully credible. (*Id.* at 7.) The Commissioner argues that the ALJ correctly found that Plaintiff's complained-of symptoms were not supported by objective medical evidence. (*Id.* at 7-9.) Further, the Commissioner argues that the ALJ substantiated his credibility determination by noting Plaintiff's sporadic medical care and infrequent use of medication which might have alleviated her

symptoms. (*Id.* at 7-8.)

An ALJ's credibility finding is entitled to substantial deference and will not be disturbed unless patently wrong. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995); *Peterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996). *See also Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001) (stating that "[b]ecause the ALJ is in the best position to observe witnesses, we will not disturb her credibility determinations as long as they find some support in the record"). However, "courts are free to more strictly scrutinize [credibility] determinations when they are based upon objective factors." *Schmidt v. Callahan*, 995 F. Supp. 869, 882 (N.D. Ill. 1998) (citing *Herron*, 19 F.3d at 335). *See also Imani*, 797 F.2d at 512 (stating that an ALJ's assessment of the witnesses will be upheld unless it is "patently wrong in view of the cold record").

When assessing the claimant's credibility regarding her symptoms, the ALJ must follow the specific requirements set forth in SSR 96-7p, which provides in part:

> In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians . . . , and any other relevant evidence in the case record.

SSR 96-7p, 1996 WL 374186 at *1. The ALJ must evaluate the effects of the complained-of symptoms on the individual's functional ability to work, taking into account the claimant's daily activities; her past work history and efforts to work; the dosage, effectiveness, and side effects of medication; medical evidence from treating physicians and third parties; laboratory findings; and any treatment the claimant receives or has received and her response to such treatment. *Id.* at * 3, 5; *see also Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir . 2004); *Luna*, 22 F.3d at 691. The ALJ may not disregard an individual's statements about symptoms solely because they are not substantiated

by objective medical evidence. SSR 96-7p, 1996 WL 374186 at *1. *See also Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). Rather, the ALJ must supply specific reasons for finding that a claimant is not credible:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *2. In order to support a determination that a claimant's testimony is not credible, the ALJ should explain how the claimant's allegations are inconsistent with the medical findings in the record. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

In assessing Plaintiff's credibility in this case, the ALJ concluded:

> Claimant's testimony was not fully credible. It is not supported by objective medical evidence, and that evidence indicates that compliance with medication treatment alleviates many of her symptoms. Further, the claimant alleges she can do almost nothing because of the level of pain. However, she takes only Tylenol, is under no continuing treatment and is on no prescription medication. That is not consistent with her complaints of disabling pain.

(R. 13.) In this case, the ALJ failed to consider the entire record in determining Plaintiff's credibility. In fact, some of the ALJ's findings do not consider and directly contradict testimony provided by Plaintiff. First, Plaintiff's testimony and the evidence are contrary to the ALJ's findings that Plaintiff "is not on any prescription medication," and "is under no continuing treatment." (*Id.*) Plaintiff testified at the hearing that she has been taking her medication "every day" since April 2003. (R. 59.) In fact, at the hearing while being asked about the Atenolol, Plaintiff testified that she had the medication with her. (R. 43.) In addition to testimony at the hearing, Plaintiff also claimed in the statement filed with her request for a hearing that she was currently taking Atenolol once a day. (R. 127.) Furthermore, the ALJ's finding that Plaintiff was under no continuing medical

19

treatment fails to consider and directly contradicts Plaintiff's testimony that she sees Dr. Gill, Dr. Petersen and Dr. Tabanet "about once a month, twice a month or something." (R. 47-48.) Evidence in the record also shows that Plaintiff participated in an EP study from May 23, 2003 to June 22, 2003 (a little more than one month before the hearing), and returned to see Dr. Gill on July 16, 2003 (two weeks prior to the hearing). Thus, contrary to the ALJ's finding, there was evidence in the record demonstrating that at the time of the hearing Plaintiff was currently taking prescription medication and was under continuing medical treatment.

Because the ALJ erroneously disregarded evidence that at the time of the hearing Plaintiff was taking Atenolol, he failed to consider that medication's effectiveness in treating Plaintiff's symptoms and the side effects of the medication, as required by SSR 96-7p. Rather than considering Plaintiff's testimony, the ALJ relied solely on Dr. Peterson's statement that when Plaintiff takes Atenolol, "she is actually minimally symptomatic but has been noncompliant." (R. 12, citing Ex. 6F at 1.) Dr. Peterson's opinion suggests that Plaintiff may still experience some symptoms while taking the Atenolol, but the ALJ failed to consider any symptoms in his credibility determination. At the hearing, Plaintiff testified that even though she had been taking her medication, she "still [has] problems all the time." (R. 44.) Plaintiff also testified that, even while taking her medication, she still experiences episodes of fluttering, dizziness, and pain. (R. 59-60.) That testimony calls into question the actual effectiveness of her medication, and should have been considered by the ALJ pursuant to SSR 96-7p. The ALJ also disregarded Plaintiff's testimony about the side effects caused by Atenolol. At the hearing, Plaintiff testified that taking Atenolol sometimes causes her to have a cough and experience cold feet. (R. 43.) Those side effects and their severity were not addressed by the ALJ in his credibility determination. Whether or not those side effects are sufficient to

explain Plaintiff's sporadic use of her medication prior to April 2003 is not for the court to decide, and is instead a factor articulated by SSR 96-7p that the ALJ should have at least considered.

Finally, the ALJ erred by relying on Plaintiff's sporadic use of medication and medical treatment in the past without considering Plaintiff's explanations, as required by SSR 96-7. In his opinion, the ALJ noted that Plaintiff received no cardiac treatment or examinations from the time of an emergency room visit in 1998 until her consultative evaluation in November 2001. (R. 12.) However, Plaintiff testified that her lack of insurance coverage and money problems were the reasons that she had not received more treatment for her condition. (R. 61.) SSR 96-7p provides that an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." SSR 96-7p, 1996 WL 374186 at *7. Although the ALJ noted Plaintiff's explanation about her lack of insurance and financial assistance from her daughter, he completely discounted that testimony because Plaintiff "worked until April 2000 so the lack of money appears to be no valid excuse for the lack of medications after 1995." (R. 12.) The record contains no evidence about Plaintiff's finances which would support such a conclusion. In addition, the ALJ failed to consider whether Plaintiff's lack of insurance had any effect on her course of treatment or her use of medication after April 2000 when her employment ended, which is especially relevant because Plaintiff's alleged onset of disability did not occur until October 2000.

Thus, the grounds given by the ALJ to support his credibility finding are insufficient. Therefore, the case should be remanded for further proceedings consistent with this opinion.

21

## CONCLUSION

Plaintiff urges that the Commissioner's determination be reversed outright and that the court order the Commissioner to grant Plaintiff benefits. Although the ALJ's credibility determination failed to meet the requirements of SSR 96-7p, it is not clear whether Plaintiff is entitled to benefits. Thus, this court respectfully recommends that Plaintiff's motion for summary judgment be granted, the Commissioner's motion for summary judgment be denied, and the case be remanded to the Commissioner for further proceedings consistent with this opinion. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72. Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

Geraldine Soat Brown
United States Magistrate Judge

April 5, 2005